Is it fair and consistent with due process that the more successful the state is in withholding its sculptory evidence, the harder it is for the defendant to obtain relief from the effects  Set another way, should the state be rewarded for successfully withholding sculptory evidence, or should the defendant's due process rights to a fair trial fade away with the passage of time because the state has successfully, over a long period of time, withheld sculptory evidence such that the defendant could not have found out the evidence with the exercise of due diligence? These are actually the same questions, and the answer to each of them is no. It is not fair or consistent with due process that the more successful the state is in withholding sculptory evidence, the harder it is for the defendant to obtain relief from the effects of not having the evidence. The state should not be awarded for successfully withholding the sculptory evidence, and no, the defendant's due process rights should not fade away with the passage of time simply because the state has been successful over that period of time. Mr. Jett, I'll stipulate with you that it may not be fair, but when I read 2254B, I have a hard time seeing where a Brady claim doesn't fall right in the teeth of that statute. I understand that, Judge. You're not alone with that. And we start with 2245E1, which says that a termination of a factual issue by the state court should be presumed to be correct. So, we can go. The state court used a different standard than the federal statute requires us to apply, doesn't it? The state court uses, as I understand it, the standard Brady standard, which is undermine confidence in the verdict. It hasn't, as far as I know, departed from that. That's the ultimate Brady standard.  So, the question that you're asking, Your Honor, is how does one avoid a due process violation, and at the same time respect the language of 2244B2B, small i, and file a Supreme Court precedent, and at the same time not eliminate the sole opportunity for a litigant in this situation to get relief for a Brady violation where the evidence was not discovered with the exercise of due diligence? And the best explanation that I have heard is the recent case from the 11th Circuit called Scott v. United States at 890 Fed Third 1239, which was decided on May 23rd of this year, which the state cited in its 28J motion. They cited it for the effect, for the reason that what that case did is it said we have to follow our prior case present in this court, but we think that that panel got it dead wrong, and they urged the en banc court of the 11th Circuit to rehear the issue and decide it the way they contend. A petition for rehearing en banc was filed a month ago, and it's still pending. The Scott case held that the Supreme Court precedent that the nature of the right and the suspension clause, Article 1, Section 9, Clause 2 of the Constitution, require a conclusion that the second in time collateral claim based on a newly revealed actual Brady violation is not second or successive for purposes of AEDPA, and it's cognizable whether or not it meets the second or successive gatekeeping criteria of 2244B2B's two small I's. And that's the way that it, why it doesn't apply. In particular, the 11th Circuit relied on Panetti v. It said that second or successive is a term of art. It takes its meaning from prior Supreme Court cases, including pre-AEDPA cases, including the AEDPA abuse of the writ doctrine. The pre-AEDPA abuse of the writ doctrine requires that a court look at the substance of the claim and ask did the petitioner have a full and fair opportunity to raise the claim at a prior application. And if not, it is not second and it is not successive because it is not yet right to raise. Well, this is actually her third claim, but the second one, the third claim was raised in what, around 2014 or so? The third claim was actually raised in probably 2012. It was after the prior ones. Yes, sir. And it was clearly after the prior ones. And the state habeas court found that the exculpatory evidence that we rely on was not available with the exercise of due diligence. They clearly found that way. There seems to, and the district court adopted that. So the problem we have is that there's clearly been exculpatory evidence that has been hidden by the state for 12 years. And it could not have been found at the district court found and the state court found with the exercise of due diligence. But because so much time passed and because so much, or she did file a federal writ, it becomes second and successive, and therefore, the standard that she has to reach to even get the merits heard is higher than the standard she has to meet in order to get relief on her Brady claim. Well, you might want to go back and look at a case that our court just decided within the past month or two. Judge Barksdale wrote the, I think he wrote the main opinion, and there was an opinion, then it was withdrawn, and another opinion came out. But the whole, the facts in that case were that the fellow had been sentenced to life in prison for 18 days, and it wasn't until the mid-2000s that he believed he had found some exonerating evidence that the state didn't look at, didn't provide to him, a forensic evidence and a witness. And he brought those forward, and the entire discussion is using 2244, whatever it is, it is treated as a successive writ and is treated with the gateway provisions that the court used here. So I mean, that's pretty much on point. So if- What's the name of it? It's the one that I held the mandate on. Why don't you give him the name of the case? I can't give him the name of the case. Maybe one of my law clerks sitting in the back can remind me of the name of that case. Well, then I'd be obviously happy to read it. The problem is, if their decision was that a Brady claim, where the evidence is material, and it's exculpatory, and it's withheld, is subject to the 2244 B2B, two small i's. Then it conflicts with Panetti versus Quarterman, and it conflicts with what I think is going to be an en banc decision out of the 11th Circuit. Which is, in that situation, when the claim is not ripe at a prior time, then you can't apply that section 2244 B2B to it. Because it wasn't ripe, so it's not second and successive. And that's what the Supreme Court held in Panetti versus Quarterman. And you can't, by definition, a Ford claim doesn't arise until execution is imminent. It was a Ford claim, I agree, I understand that. But by the same token, what evidence has been withheld by the state, you cannot, at the same time, it's not ripe either because you don't know. How could a claim be ripe when you don't know that you have it and that it exists? Well, what I'm trying to advise you is that that's an argument for an en banc petition. But that's not the law in this circuit at the present time. My law clerks can leave here and go upstairs and get a citation if they want to, and we'll provide it to you by the end of the argument. Well, I'm sure that if the court rules the way it indicates you're going to rule, then there'll be an en banc petition coming. Well, I'm not trying to bully you. I'm just suggesting you have five minutes left and you might want to get to the merits of your Brady claim if that's where you're headed. Well, in terms of the merits of the Brady claim, the district court, actually the state habeas court, found that there was a Brady violation. They found all the elements. The district court found the same thing. Now, so the question, pardon me? Except for materiality. Well, actually, I think that the district court found materiality, but the problem was is that they found that we didn't reach the clear and convincing standard required by 2244 B2B. The basis for that was that the defendant herself had claimed to have been the individual who dragged the witness misidentified. That's the Brady violation. The notes indicating that the witness had changed her testimony as to what she saw. But ultimately, the defendant herself, I believe in the police interview and at trial, testified at trial, that she was the one who had moved the victim. Is that correct? And that it didn't matter whether there had been a misidentification by somebody else. Actually, I think it does matter. And I think it matters because, A, they weren't aware of that evidence. She wouldn't have testified if they'd been aware that the complaint, that the witness had identified a black male instead of a black female. I understand that argument, but didn't she also state to the investigating officers that that was the case at the time of the crime? Well, I understand your argument about testimony, because that's a fluid thing that it develops during trial. The decision is made right up to the moment the person walks up to the witness stand, whether she's going to testify. So I'll grant you that. But isn't she already claiming prior to that in speaking to the investigating officers? Actually, there's a conflict in the testimony about that. Officer Canales said she did. Officer Negrete said she didn't say anything else, but I didn't do it. And then there's testimony from Officer Ermettinger that was done in rebuttal. That would have never come in because she went to testify, and he could only testify in rebuttal because any statement that she made to him, she was under arrest, and he didn't give Miranda warnings. So that wasn't going to happen, and as you said, trials are fluid. And our contention is, even though she makes the Brady claim, we also contend that she makes the clear and convincing evidence claim. Because what you have to consider is you have to consider how the exculpatory evidence would have changed completely the way the trial was conducted. Some of it that I just mentioned to you. She doesn't testify. Ermettinger doesn't testify. The jury doesn't hear Officer Harrison say she didn't change her mind in any way. When we know she changed her, the witness, Ms. Adams, changed her mind twice. First she changed her mind about whether she saw first a black male, and then when she talked to the police a couple hours later, it became a black female. And there was a statement that was written by the police officer that said it's a black female, and that testimony changed over a few hours. And then the testimony changed again when the officer, or would change again when the, because the officer said she didn't change her mind in any way, well, we know that that's not true, she changed her mind twice. What do you say about the bloody socks? What I say about the bloody socks is that this is a very stressful situation, and I don't think that Ms. Blackman remembered exactly what happened. It was a very frightening circumstance. And whether- She had her socks on when she was treading through the blood, or she didn't. Well, I understand, but the blood, but that doesn't mean that she's the shooter. She could be running around the apartment without her socks and doesn't remember that she had the shoes on or didn't have them on. And her implausible alibi, and then her, you know, the shell casings consistent with the gun, and she brought up the gun. And- If you, to the, to the investigator. Actually, I think the investigator brought it up and she confirmed it and told him the truth. But the, the thing that, that, that, that none of this takes into consideration is that Ms. Adams, the witness in the courtroom, could not identify her as the person she saw on the balcony. She couldn't do it. She never did it. So you have the conjunction of the fact that, that the, the witness identifies a black male, and then the, the witness changes her mind and says it's a female after having talked to the police. And then in the courtroom, she can't identify her. That's even better for the defendant though. Not only did she change her mind, which of course didn't come out because counsel wasn't aware of it, the defendant wasn't aware of it, but here she has the very person in court who scans the courtroom and doesn't see the person she saw that night. And that's, that's- The jury saw that. That's right, but the jury didn't have the other information that we've been talking about, the other misidentifications, the two times she changed her mind. And I see I have the red light. On my time, just one quick question. On the 9-11 call, that, that came out at the trial, didn't it? That, that Ms. Adams made a, a 9-1-1 call? Not that one, one 9-1-1 call. There was a 9-1-1 call. But what there wasn't, or what, what the defense never had a copy of was the 9-1-1 call that says it was a black male. When my client- But I mean, if he knew there were, there were 9-1-1 calls, wouldn't, wouldn't a diligent counsel go try to get the transcript? It was exculpatory. Mr., Mr. Belt says he asked for it. It was clearly exculpatory. The state had it and they didn't turn it over. And the state habeas trial judge found that they knew about it and didn't turn it over. Thank you. All right, we have time for rebuttal. Pardon me? You have time for rebuttal. Ms. San Miguel. May it please the court. This case is about a woman convicted of murdering her roommate, attempting to bypass the successive petition statute because she cannot meet its requirements. The law is clear on this issue. Under the second prong of the successive petition statute, a court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would satisfy the rules of evidence. So Blackman cannot demonstrate by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found her guilty of murder. In deciding if Blackman meets this second prong, the district court gives a rubric. Start with the evidence produced at trial, and then you add the evidence that was allegedly kept from the jury as a result of a constitutional violation. And then you determine whether it's clear and convincing. You look at the evidence as a whole, and you ask, would no reasonable fact finder have found her guilty? But Blackman starts with the evidence produced at trial, adds the Brady evidence, then subtracts the evidence produced at trial as it suits her, and argues that the Brady violation has probably resulted in the conviction of one who is actually innocent. So if you just look at the evidence relating to this Brady violation, Teresa Adams testified that she heard gunfire, and within two to three seconds, she went to her back window, and she saw a petite black woman pulling a lifeless body that was half inside, half outside the apartment upstairs, upstairs apartment across the walkway from hers. Blackman testified that she pulled her roommate's lifeless body inside their apartment. She also stated that she saw Adams watching her while she was doing it, and she identified Adams in court as the person who was watching her through the window. She looked at Adams and she said, her hair is darker now than it was then. So though Adams may not have identified Blackman in court, Blackman identified Adams. There should be no question as to what Adams saw. So- What about the Blackman she saw? She called, when she called 911. So there was an evidentiary hearing, and Black, I mean, Adams was questioned about that, and she said she didn't remember saying that on 911, on the 911 call, but she listened to the tape, and she said, yeah, that's me. I guess I said that, but it was a woman. I'm absolutely sure it was female, and she gave a very specific description of the woman, and the description of the petite black female with her hair pulled back, wearing a racer bra and a white shirt and blue jeans, exactly the same description at the evidentiary hearing and at trial. And interestingly enough, on the prosecutor's note, that was supposed to be exculpatory evidence. So if that evidence had been admitted at trial, it certainly probably would have been used to impeach her testimony, but it also could have strengthened her testimony because the description that she gave the prosecutor was exactly the description that she provided at trial and at the hearing, and she- Well, Adams was your key witness, right? Adams is an important witness, I would say that's true. And you didn't have a murder weapon, you never found a gun. I never found the gun. The bullets and shell casings would have fit the gun that Blackman brought up to the police officer when he was doing a hand washing to determine if she had gunshot residue on her hand. She didn't, they couldn't- It was inconclusive. Well, but you couldn't say that she had residue. Right, it was inconclusive. You said they fit the gun, but they tested forensically to see if they, in fact, came out of that particular weapon or did you not have the information because the gun was not found? All those shell casings and bullets and all of those things would have fit Blackman's gun that she said she had. Then she said she lost it or it was stolen. Then she couldn't remember when it was stolen. She gave two different stories on the stand. First, it was two months after she claimed it from the property room. Then it was two months before this happened, I believe. It was confusing. So I would argue that her story is not very convincing. But there's something else that I wanted to, besides the two officers that you already mentioned, Judge Engelhardt. Detective Ermatinger and Officer Canales testified as to what Blackman told them. There's no discrepancy in that testimony. It all matches. One officer who also entered, Officer Negrete, who also entered the apartment, along with Officer Canales, said that that's all she said was, I didn't do it, I didn't do it, but Officer Canales gave the story that she, apparently she talked to Officer Canales and not to Negrete. Also, Negrete had a different partner. So I would suspect that he wasn't with Officer Canales. Also, just as an aside so that I don't forget, Ermatinger testified that she got her Miranda rights, she was read her rights. So if you add the Brady evidence, it's impeachment evidence. And that's really important because newly discovered impeachment evidence, as you probably already know, will seldom, if ever, be sufficient to establish actual innocence. So Blackman would need new, reliable evidence, like critical physical evidence, DNA, something like that, trustworthy eyewitness accounts. She has none of that. As impeachment evidence, I've already mentioned this. We know how Adams would have been impeached because she said, and she was strong in her testimony, one that, yeah, that was me on the 911 call, but I'm sure of what I saw. And the other thing is, I picked the person I saw moving the body, that's, and I didn't pick someone else, and she was clear on that. The other thing that's extremely important, I think, is this new evidence would not be impeachable as to when Adams saw the Blackman dragging the body. So Adams saw Blackman within two to three seconds of gunshot. It's all, it would have been impeachable as to, did you see a black male or a black woman? But she, you can't impeach the timing on that. Nothing has- I mean, Adams wasn't the strongest witness in the world. She couldn't pick out the defendant in the courtroom. That really is rather irrelevant when Blackman picked her out in the courtroom. Well, what he's- No, that was a friendly question. Oh, Adams wasn't one of the strong, I'm sorry, I didn't understand you, Judge Davis. What did you say? I'm sorry. No, I mean, what do you make of the fact that she couldn't pick out the defendant? And in response, I would say, well, Blackman was able to pick her out and there should be no question as to identity when so many other people testify that evidence as to what Adams saw as cumulative. Well, if Adams were impeached and the jury didn't accept her testimony, what else did you have? Bloody socks? No, yeah, bloody socks for sure. What else? Before you answer, and I want to hear your answer to Judge Davis' question, assume that the defendant, several times you've relied on the fact that, well, the defendant said such and such, like what you just said. She picked Ms. Adams out. Assume the defendant doesn't testify, so his question is, what else did you have? The bloody socks, go ahead. Well, first, I'd like to respond that I don't believe you can assume that the defendant wouldn't testify. Well, I'll answer the question when I have to. What else do you have is the officer's testimony, and you also have the bloody socks, and you also have the missing, the gate key that she said she didn't have. She went to the, said she was going to the store, and then she said she didn't ever make it to the store. She left her roommate after being with her all day, and she returned five minutes later to get her gate key, and she couldn't explain why she couldn't just call her roommate to buzz her in. So she said, I don't know, she might be going someplace, I don't know. So it was an actual innocence claim. I don't believe that is very strong evidence in her favor. Was there blood on the floor where she could have walked in the blood without being the shooter? There was blood in the living room. There was blood in the bedroom. I think this is important, that there was a used shell casing in the bedroom, suggesting that the first shot occurred in the bedroom, and then there were other shell casings in the living room. The whole sequence of this is, there were several shots fired. And then, Ms. Adams, how fast did Ms. Adams place her 911 call? She had the phone in her hand when she saw it, so within seconds. So, the defendant here, the blood was on the underside of her socks, and she was traipsing around with shoes on. And isn't that what the detective saw was particularly incriminating? It is particularly incriminating, and especially so when Blackman testified on the stand that she didn't take off her shoes. And Detective Harding, who interviewed her, said, she asked her several times, are you sure you didn't take off your shoes? And she was insistent that she didn't, yet there was blood on her socks. So, it wasn't just a casual mistake. And then, how much time elapsed between when the 911 call was made and when the police arrived at the scene? Five to seven minutes. Okay. So, Ms. Blackman, if she did it, I mean, she's convicted of doing it,  but did she try to get out from the balcony and then, presumably, go wash her hands and put on some shoes or something like that? Yes. Was there any theories to what happened to the murder weapon? It's suggested at trial, because Adams said that she saw Blackman two times, once dragging the body, and then, maybe five minutes later, leaving the apartment and going downstairs, locking up. So, it wasn't said, but I would assume that that's when she got rid of the gun. I know we've been asked a lot of questions about the Brady issue. What about statute of limitations? I guess I would assume this was a second petition. Or this was a bona fide, in the same as a first petition, right? Yes, right. And it would have been under the one year period? It wouldn't have, because she received the prosecutor's note on August 27th, 2009. Let me go back. First, Blackman's attorney states that he received the case, or was hired for this case, in October of 2008. And this district attorney, Craig Watkins, changed the file policy in the Dallas County DA's office in 2007. So, he requested, I believe it was in, well anyway, he got the file in August. He requested in April of 2009. He got the file in August of 27, 2009. In the file, there was a call log, a 911 call log, and it did say blackmail. And on the prosecutor's note, there was not only that little notation that would alert a defense attorney of a Brady violation. There was also, she called 911, and when she called 911, that was there again. But he didn't receive the 911 tape until in preparation for the evidentiary hearing in state court, that's 2011. So, and he didn't follow state writ until December 17th, 2010, after the federal statute of limitations had already run. And then he filed a federal petition, and this is with an attorney. Not pro se, on May 14th, 2013. So under Flanagan v. Johnson, this court has held that the factual predicate date for newly discovered evidence means the date a petitioner is on notice of the facts which would support a claim, not the date in which a petitioner has in his possession evidence to support a claim. And I would- She didn't know if she had a claim, did she, until she found out whether trial counsel knew about this. Wasn't that an element of her Brady claim? She, I would argue that she knew she had a claim when she saw the prosecutor's note that said pick someone else out, first chose someone else out of the lineup. Why wasn't it an element whether counsel knew about it? She knew about it as of August 27th, 2009. Trial counsel. Trial counsel knew about it as of August 27th, 2009. Trial counsel argues that he needed to contact Mr. Belt, the trial attorney, get an affidavit from him, contact the appellate attorney, make sure he had a- knew he had a Brady violation, gather all of these affidavits. And in my research, I couldn't find any law, any cases that would say that you get all this investigation time for the statute of limitations. The point is, if he had been- if he had read the trial transcript to begin preparing to do some post-conviction- if he had read the trial transcript, he would have seen all the business about Adam's identification. And then he would have found the call log and the prosecutor note, and he saw, oh my gosh, you know, this didn't all come out. I mean, it would have clicked immediately, I would think. At least by the time he got the prosecutor's file. By August 09. Yeah, August 27th, 09. I mean, to give him the benefit of the doubt, I'm not sure that there's any alert to a Brady violation if you just read the trial record. But if you get the- Oh, I know that. Okay, I'm sorry, I didn't understand the question. All right. So her petition should be dismissed as successive. It's a Brady violation. What cases did the district court cite in support of her due diligence finding under 2244? D or B, statute of limitations or successiveness? I said under her 2244 statute of limitations.  Yes, ma'am. As I recall, the district court conflated the statute of limitations analysis with the diligence analysis in 2244B, the successive petition. The district court said, well, I found that she was diligent under 2244B, therefore she's diligent under 2244D. Okay. And I disagree with that because there's a time limit on the statute of limitations. So the definition of diligence may be the same, not with the statute of limitations. I'm asking the court to abide by its prior decisions and find the district court correct in its procedural ruling. Okay. And by prior decisions, I'm talking about in this court when this court, I mean in this case, when this court in response to Blackman's argument to this court in her motion to file a successive petition that she should be exempt from 2244B, this court cited Segura, I believe, and Johnson v. Dracke and Leal v. Quarterman and said we would follow our binding precedent. So I'm asking you again to follow binding precedent and find that Blackman failed to meet the successive petition statute. And also I would ask that you find her barred by the statute of limitations as well. Did you have any more questions for me? Thank you so much. Thank you. Okay, Mr. Jett. Your Honor, I want to cite you to the habeas court's finding of fact number two where it found that the officers were at the apartment complex eight minutes later, but it took them another 10 or 15 minutes to find the particular apartment. So there was anywhere from 18 to 23 minutes of time from the time that the 911 call was made until the officers came up the stairs and went into the apartment. Many things could have happened since then or in between that time. There was discussion about what about the blood, what about the guns. That's a crime scene. There's no question they're bullets or guns. It's a crime scene. But the fact that it's a crime scene doesn't show that Ms. Blackman was the perpetrator of the crime. She and her roommate had been the subject of break-ins before at another apartment complex, and there was the officer, I mean, the witness. First she said she saw a black male. You can put those two things together, and that's evidence that there would be somebody else. And this is something we developed in the writ hearing. And so the court should take that into consideration. The other thing the court should take into consideration in determining did we meet the standard is all the evidence from the eyewitness expert that showed all the difficulties with the eyewitness testimony. The testimony about the 911 call, testimony about she didn't change her mind, all of that was not just impeachment evidence. It is direct evidence. The fact that she saw black males is direct evidence that there was somebody else who was the shooter. And besides that, impeachment evidence, and there's lots of cases, can be plenty, plenty in order to get to the point where you reach the standard for a Brady violation. Probably the better case is East v. Johnson, which is a Fifth Circuit case, which is cited in our brief. In regard to the limitations issue, what happened there is that I was hired by Ms. Blatton's family to look into her case. The very last thing that I did, well, first I did a lot of things. I read the record. I asked the DA's office, can I look at your file? Initially they said no. We're going to send it to the Attorney General. The Attorney General sent back and said, well, you're not entitled to a bunch of stuff in the file. And then they just allowed me to look at the file. The very last thing that I did was to go look at that file, and I saw the note from the prosecutor that said the witness, Ms. Adams, picked out one witness or one person out of the lineup and then changed her mind and picked out another. And that's the first time anything like that had been made known to anybody who was representing the defendant. So what I had to do was to make sure that that evidence had not been provided to, and the other lawyers who preceded me, a trial lawyer, a writ lawyer, and a penalty lawyer, did not have that information. None of them had that information. The trial lawyer never got the information. And until we had that information so that we knew that the information had been withheld from counsel, that we didn't have a Brady claim, and it took a little while to do that, and the district court found that we exercised reasonable diligence in getting to that point, and once we got to the point that we timely filed the writ applications, and the district court found that it was timely. What do you say about the Flanagan claim, the Flanagan case? Are you familiar with that? I know I cited it in my brief, but I don't remember which one it is. Well, I'm not going to tell you. I remember the facts right now, but they did say you do the time limit goes from when you discovered the facts underlying the claim. It's the vital facts case is what it is. The problem, we fit within Flanagan because the mere fact that there was some exculpatory evidence is just one element of what we have to show. We have to show there's exculpatory evidence. We've got to show that it was withheld, and we have to show it's material. Until we can show a prima facie case of all of those things, then we don't have a claim. And the magistrate and the district judge agreed that until such time as we had a case, a prima facie case that we could file that would not be subject to dismissal under Rule 4, that it wasn't right. And that gets us back to Panetti v. Quarterman. And this is where I'll give you the citation. N. Ray Davila, D-A-V-I-L-A, 888 Fed Third 179, decided April 23rd of this year. 888 Fed Third 179, April of this year. Apologies to my law clerks. I had it in my bench book. But anyway, it applies this successive petition standard to a Brady claim. I actually read Davila, Judge, and I didn't find that it was on point with this case, and I can't remember why. The one other thing that I would like to say is that what Ms. Blackman wants is simply a hearing and decision on the merits of her Brady claim. That's all. And if she doesn't get that, I can't see how it doesn't violate due process, and I can't— I mean, even under pre-AEDPA law, it is not at all clear to me that you would have gotten a decision on the merits of the Brady claim because the McCleskey case had put in serious limits on successive petitions. The Scott case from the Sixth Circuit finds, and we agree with that, that the Ford claim is similar to the Brady claim because they don't ripen until a certain point in time. And so Brady is just like Ford, and Panetti v. Quarterman didn't say there was just one exception to a Ford claim. What they said was there were a number—they used the word exceptions, and Brady would be certainly an exception because it deprives somebody of a fair trial, and if you eliminate this class of litigants from having federal review, then what you do is you suspend the writ under Article I, Section 9 of the Constitution, and that's a very serious matter, and I don't think the Supreme Court, and I think under Panetti v. Quarterman, that they would do that. So we ask that the Court reverse the decision of the district judge and send us back so we can have a decision on the merits of the Brady claim. Thank you. All right. Thank you. Oh, are you court-appointed on appeal? Yes, ma'am. But you were retained below? I was— No, I was actually appointed below. I was initially retained, and then I was—in the middle of it, I was court-appointed. So you can make the big bucks. Well, anyway, of course, you've done a very good job, and we certainly appreciate your service as a court-appointed. Thank you, Your Honor. It's a pleasure to be here. All right. Thank you. I guess we'll take—